Choh v. Brown University Attorney Davis. Good morning, Your Honors. Joshua P. Davis of Bergamonte for Plaintiff's Appellants, Ms. Kirk who is in the courtroom today, and Mr. Choh. And this case involves the Ivy League schools' agreement not to offer athletic scholarships. Under NCAA v. Alston, the horizontal agreement on price, that horizontal agreement on price, is unlawful if plaintiffs satisfy the rule of reason analysis. And to satisfy that rule of reason analysis, plaintiffs must simply offer non-conclusory allegations that plausibly establish that the Ivies entered into an agreement not to offer athletic scholarships, and that that agreement had anti-competitive effects, that it in fact deprived Ivy students of athletic scholarships. And they have made those allegations plausibly. So you're jumping, I guess the premise of your argument so far is you don't need to define a market for the purpose of assessing whether there are anti-competitive effects. And I'd like to hear a little bit about how one can assess anti-competitive effects without understanding the relevant market. Right. So I'm trying to set up the larger framework. I do think that that is true, but I don't think the court needs to reach that issue today because the direct allegations that plaintiffs have made of an anti-competitive effect do define a relevant market. The point of the inquiry into a relevant market and market power, the definition of a market for these purposes, is what group of market actors, if they were to enter an agreement, would be able to have an anti-competitive effect. That is the definition of a market for these purposes, Regeneron, American Express. Well, but an anti-competitive effect, that doesn't exist. Anytime a price goes up, that's not an anti-competitive effect, right? If I'm a seller and I say I'm going to raise my price, the price has gone up, but it's not anti-competitive because somebody can go buy from a different seller. They could. So the question is, right, so a couple of things. The main one is that as this court held in Regeneron and other courts have held consistently, including American Express, direct allegations can suffice to establish market power and thereby a relevant market. And so if you had an individual actor raising prices, the fundamentals of antitrust economics are either they did it because that's what the market would support or it would not be sustainable. And that's why we use, to be a little technical in this setting, the hypothetical monopsonist test, or for sellers, the hypothetical monopolist test. What you'd ask is precisely, is this actor alone or with others able to change prices by a small but significant amount for a non-transitory period and succeed and be able to do that under those market conditions where market pressure would otherwise render that impossible? So how do you apply that? And I think maybe this question reveals my frustration with something nobody's really challenged, which is this definition of the elite student-athletes, right? So when you have a world where these schools have tens of thousands more applicants than they accept, how do you even run this hypothetical SSNIP test? Right. I mean, you're not going to be able to measure the effect on the demand when the demand is going to backfill anybody who switches to a cheaper product, so to speak. Right. So the most straightforward way to run a test is you ask, all right, could the Ivys together pay less for student-athletic services than they could individually? That's the test. And there isn't actually very meaningful. Is that really the test? That is the test, because what we say is, look, an Ivy can charge whatever it wants if it can do it on its own. But if you need horizontal price fixing in order to achieve a price effect that you otherwise could not, that is the very definition of an anti-competitive effect. Now, there may be offset pro-competitive effects. Doesn't it presume that folks won't go elsewhere because they think Stanford's just as good as Cornell? It doesn't presume it. It proves the opposite is true. You self-acknowledge it, because all of a sudden, when your argument gets into a bit of trouble, you offer an additional market that's somewhat undefined. A dash of Notre Dame, a bit of Duke. Right. The thing that makes this difficult to understand is that students go to different schools not just because of the cost of the availability of an athletic or non-athletic scholarship. They may go for other reasons. You might be interested in both, but they go for other reasons, don't they? And so don't you have a problem about the interchangeability here and the availability of alternatives? We don't because we know. We know. We have alleged and we know. And, in fact, the Ivy's arguments in opposition confirm. They make pro-competitive justifications all on the premise that the Ivy leagues together can agree not to offer athletic scholarships. But the agreement would make no sense, and it would have no effect if each individual Ivy could do that on its own. And so what we know is this is a horizontal price-fixing conspiracy, at least plausibly, that works. So what's your strongest – because that's not the way the sort of test is typically framed in the cases. What's your strongest case for the notion that it's almost sort of a circular notion? If they do it and it works, it must be anti-competitive. Yeah, so it is not circular because what it is is a natural experiment, right? And Regeneron says this explicitly. I actually think the opposite is true. I often end up arguing on appeal on this very issue. And one of the hardest issues about it is it feels so straightforward that it can't be right. But the courts and economists consistently say this. The ultimate inquiry we're trying to determine – the ultimate issue we're trying to determine when we're talking about market power is, is there a difference when a bunch of competitors get together on price or output or quality versus if they price independently? And if they do, if they do price differently when they're together, we are past that first step. And we have directly shown anti-competitive harm and defined an appropriate market. And the cases that say that, that's – And you said and defined an appropriate market. So what is it? It is the market consists of those participants in the successful agreement. That is a plausible market because it works. So you're basically defining the relevant market by the scope of the agreement. Yeah, and the Supreme Court, quoting Bork, the Supreme Court and Superior Court of Trial Lawyers, quoting Bork, said, very few firms that lack power to affect market prices will be sufficiently foolish to enter into conspiracies to fix prices. Thus, the fact of agreement defines the market. And here, it's not just the fact of the agreement, which the Supreme Court, in that case, at 493 U.S. 411, 435, note 18 said that. It's also true in FTC versus Indiana Federation of Dentists. It's also true in the very test defined in Regeneron. It's true in Amex where the Supreme Court said direct evidence suffices to define a relevant market. All of those cases are trying to get at – it's not just who's in the agreement, but that the agreement works. If you have an agreement, this is – I've taught to the federal judiciary with economists at Stanford this issue of what do we mean by market power. And they all get so frustrated because from an economic perspective, it's straightforward. If you see them get together and if they succeed in having a price effect, that is the very addition of market power. Why do lawyers get so turned around and think it's – they're so – What if there had only been seven of the IVs that agreed, the almost IVs? Would the seven be enough? If they were successfully able for 70-plus years to sustain a price fixing – Tell me how you define successfully able to sustain. You mean because people attend those schools? Because they – yeah, so the test is – And don't get paid to play? My apologies for interrupting. No, that's okay. It's the difficulty of my being here, and I apologize for that. I would love to be there, but I couldn't. Not at all. So we actually have unique circumstances here. So the success, first of all, is that they are successful at not offering an athletic scholarship to any of their students. And in fact – and so – and have done that for 70-plus years and continue to do that because the economic theory and the doctrine say – Is it the question, though, that if someone really wants an athletic scholarship, they're – they have no – they have no opportunity to get a comparable education that the IVs offer? Is that it? The test would be not that. What comparable – where the rabbit goes in the hat, and this is where I think the district court got led astray, is it is not a functional substitute. It's not just, hey, that's a really good school, both academically and athletically. Some might say better. So the question is – some might say that about – Yeah, it's all a question of perception, isn't it? Right, but there's a test for it, which is cross-elasticity of demand. And this is what the second – this court said in Regeneron quite recently, which is it's not just that. The question is – and this is bedrock antitrust principles. The question is if you get a group of schools together and they agree on price, we are going to have zero price for athletic services. And they don't experience such a substantial loss of students that they are unable to sustain. If they are able to sustain that on – for what's a non-transitory period, usually a couple of years, but here it's 70-plus years because they're not hemorrhaging so many students, that is the very definition of market power. Well, no, wait a minute. You don't care whether they're hemorrhaging students. You care whether they're hemorrhaging elite student athletes, right, who would be competitive at the top levels. And truth be told, they kind of are hemorrhaging those, right? I mean, nobody's picking Cornell in their NCAA pool, no offense intended. Right, but they never were. That's not their goal. But I think it's actually do the Ivies – are they able collectively to sustain this policy that deflates prices? Right, but figuring out what sustaining means is sort of interesting. If the question is are they losing elite student athletes, it seems like it's going to be tough to plausibly allege that they're able to attract the – at a significant level the student athletes who have these options of going all these other places where they can get scholarships. They are. They're going to Stanford. Well, so just to be clear, the antitrust test is – it is the SNF test where when you're a buyer here, unfortunately the dip test, the small but significant non-transitory decrease in price. And the question is by sustaining it is really do they hemorrhage – of course they're going to lose some people. The losing some students is not the test. The test is – and it's articulated this over and over in the case law, Supreme Court and Second Circuit, do they lose so many students that they have to abandon the horizontal price-fixing conspiracy? So your theory would apply to, I suppose, not just student athletes in the Ivy League, but the fact that elite students have access only to need-based financial aid in the Ivy League, but they might be able to get merit-based financial aid in other places. I assume that the implication of your theory is that it isn't just a sports thing, that in its provision of education and scholarships to support that or financial aid to support that, there's an antitrust violation here. No. No, that doesn't follow. And the reason I would say that doesn't follow, Your Honor, is because you have to get into the rubric of NCAA versus Alston, where what they're saying, what the Supreme Court chafed at, was the idea that an agreement not to compensate labor, so that they said, look, athleticism is labor. This would normally be a per se violation. Because of the educational context, it's an ordinary rule of reason analysis. It's not at all obvious to me how there's unpaid labor on merit scholarships. That doesn't trigger an agreement to underpay or refuse to pay for services. And so I don't see anything akin there. I don't see a merit scholarship that's involving unpaid labor. It's a different rubric entirely. So now we're getting back to the foundational question here, right, which is do antitrust laws even apply in this scenario that you're describing? Alston was a very particular scenario, right? It was football. It was Division I basketball. It was markets where schools are making a lot of money because of the athletic performance of the students there. I'm hard-pressed to see how any school is making money because of the wrestling team or the lacrosse team or the swimming team other than maybe the top school in the country. It's a strange notion. So to be clear, our case does involve those sports and the sports that make a lot of money. And we put in our allegations that there is a significant amount of money that the Ivy Leagues are making from this. And that kind of fact-specific inquiry in terms of the scope of this and all of that, that is appropriate once we get discovered, right? I mean, another issue here that I don't want to understate is we are at a 12B6 stage. Alston emphasized over and over again, that was, of course, much later in the proceedings post-trial, that this is a reality-based, fact-specific inquiry. So did Regeneron. So did Todd v. Exum, which is a very similar buyer-side case there involving an information exchange under the rule of reason. Where, by the way, this Court said the very fact of the scope of the agreement is highly confirmatory that that's appropriately defined market, that the defendants reached out to each other and only to each other does support the inference in a horizontal agreement that that defines an appropriate market. And this Court said, given that and the very fact-specific nature of the inquiry, the Court reversed a dismissal under 12B6 for failure to state a claim. So what we would say is at the very least, at the very least, this is a case where a series of fact-specific questions arise. And it was way premature to say, to draw an inference that's contrary to the allegations, that there are other schools enough like the Ivey's to deprive them of market power. All right. It sounds like we're done for now. We'll see you in a minute. Thank you very much. Attorney Waxman. Thank you, Judge Robinson, and may it please the Court. As the Supreme Court explained in Brown-Shue, antitrust plaintiffs must, in their complaint, identify the relevant market so that courts can assess, quote, what the area of competition is and whether the unlawful acts have anti-competitive effects in that market. This circuit repeatedly, in at least a half a dozen cases, has made clear that that pleading requirement applies even where the plaintiff seeks to proceed by showing direct effects of an agreement, a horizontal agreement, among competitors. The court below was entirely correct that the plaintiffs failed in this threshold obligation. The Ivey League is not a plausible market because, as has been noted, the complaint itself acknowledges that schools outside the Ivey League offer student-athletes both elite athletics and academics. At paragraph 11 of the plaintiff's complaint, they say that these, they name a couple Stanford and a few other schools. These schools are not part of the Ivey League, but they demonstrate that they can maintain stellar academic standards while competing for excellent athletes and without agreed-upon limits on price. That's the plaintiff's own case. Wouldn't you agree if what we're talking about is a total of 12 schools instead of 8 or 14, that if there's a conspiracy among 8 to pay nothing, that that would relieve pressure on the other schools, the other comparatory schools, to pay comparable amounts? In other words, if a student has 13 schools to look at and 8 of them have decided to pay nothing, surely the other 4 or 5 can pay less and still get the elite student-athletes. If, Judge Jacobs, if a complaint alleged those facts, in other words, that the market was, and one of the difficulties in talking about this case is there is no market for all athletics in 44 different sports. The plausible substitutes for a female, a 5-star, a brilliant 5-star female basketball player are not the same as the reasonable market substitutes for a male downhill skier who isn't going to say, oh, I can only look at the Ivey League even though only Dartmouth and Harvard and for some reason not Cornell, offer skiing and I want to pursue it. The hills are too small, Mr. Waxman. The hills are not enormous in Cambridge, Massachusetts either, Judge Wesley. But in any event, that's one of the problems. But let's say you alleged a market in which, let's take women's lacrosse, and you said, look, the market is for academically and athletically qualified female applicants and all of the, I believe, all of the Ivey League schools offer this and there are the following other schools, Duke, University of Virginia, Stanford, Northwestern, that offer top quality Division I athletics and wonderful academics. But the Ivey League doesn't pay athletic scholarships and that has led the non-Ivey League schools to reduce. You would have a definition of a plausible market, that is, the Ivey League schools and an identified set or some means of describing a market as a whole. That's the question I'm asking you because half of the competitors agree to pay nothing. The other half of the competitors are under much less pressure to offer fair and competitive rates. I'm with you 100% on that. In this case, number one, the Ivey League schools are not offering nothing and although plaintiffs allege that Ivey League athletes have to pay more for college than they would if they had got an athletic scholarship, they are not alleging and they couldn't allege that Ivey League athletes pay more to attend college than schools that offer some athletes athletic scholarships. But the point here is that, the other point I think that distinguishes your hypothetical is the other schools haven't stopped offering athletic scholarships, even the schools that have high academic standards and high athletics. They're not saying, well, the Ivey League seems to get away with this, why don't we? They could, but they couldn't. Well, let me suggest that in the 72 years since this alleged horizontal price-fixing conspiracy was cooked up, there isn't any evidence whatsoever that schools in the other 51 conferences in Division I are not offering athletic scholarships because the Ivey League gets away with it. If the Ivey League conference can do this, as you argue, why can't the other 51 conferences also do it or within their own parameters? As the District Court and the Court of Appeals and the Supreme Court in Alston said, the issue in that case, the dispositive issue in that case was, it was the entire NCAA that had this barring rule, and the less restrictive alternative was that individual conferences can have restrictive rules in whatever way they want because they don't have market power. The nature of this rule is what... Is this consistent with what Judge Kavanaugh emphasized? I think for Judge Kavanaugh speaking for himself alone... Yes, but he was purporting just to clarify what the court was doing. I mean, there is no justice agreed with his clarification, but Justice Kavanaugh's entire focus was on the doctrine that applies where there is no dispute what the product or geographic market is. It was FBS football and Division I basketball in all schools in the NCAA, Division I, Division II, Division III. It wasn't an individual conference. That's what Justice Kavanaugh was talking about. Now, once you take the conference away, figuring out what the comparable schools, there's no offer of some kind of indices here to decide who the comparables are that are getting away with not having to pay as much because the Ivies have exempted themselves. Is that the case, Mr. Weiss? Yes, I mean, even in their... How do you decide what the comparables are? I would suspect there are far more. Michigan might feel like it's entitled to a designation. Indiana perhaps. I don't know. A number of schools. I mean, certainly, and again, it depends on what sport you're talking about. Right. It certainly depends on sport because in lacrosse, Cornell has national ranking. In women's hockey, Cornell had five women from the Canadian national team, no less. And so it seems to me that there are too many variables here to make any kind of meaningful statement about what the economic impact of this is. It's hard enough to figure out what the marketplace is. I mean, the point, I think the point is, and this is certainly what Judge Robinson decided, was that because there was a failure to identify a plausible market, even for purposes of their allegation of direct economic effects, they can't establish that without knowing what the market is or even, you know, with respect to the sort of contours of the market, simply by providing an illustrative list of other schools, it fails to state a claim under the antitrust laws because until you understand what the market is, you can't evaluate whether there are significant anti-competitive effects throughout the market. I'm sorry. In your view, what is the product market? Students, education, athletic services? The product market, I mean, I think this is probably more fairly a question for my friend on the other side. I'm going to ask. I just was wondering what you think. You're saying there is no market. I'm saying that there is no market, particularly since they've defined the market as all sports. A market is defined by the reasonable substitutes. So you're saying there's a failure to define a product market. Yes. And that's what Judge Robinson found. I get distracted every time you say that because I'm like, I didn't find it. I'm sorry. I'm sorry. The complaint alleges that there is not cross-elasticity of demand between the Ivy League institutions and the comparable other institutions. It also alleges, and this gets into the rule of reason that, you know, trying to anticipate the next step that the schools that aren't offering the scholarships do perfectly fine. The district court read that as essentially a concession that there is cross-elasticity of demand with those other schools. And I'm just wondering whether at the pleading stage that's too big a leap. It seems like the Supreme Court has suggested that these are really evidentiary questions that need to be developed. Why shouldn't we let this go a little further? I mean, this court, as my friend has pointed out, has said that, you know, ordinarily in an antitrust complaint, you go through discovery and perhaps trial. It said that most directly in its decision in Chapman, which, like many other cases I could cite to the court, including City of New York and Topps Markets, then went ahead and affirmed a dismissal because of the inadequacy of the definition of a plausible market. In City of New York, in Chapman, it was the alleged market for restraint training services for childcare facilities. And what the district court and this court said is there's no, it's not plausible that the market for restraint training services is different for childcare facilities than for schools or high schools or other environments. Therefore, you haven't adequately defined the market. In City of New York, the City of New York brought a Section 1 case saying, well, there are two healthcare providers that provide healthcare services for city employees and they're merging, and that's anti-competitive because the relevant market is healthcare companies that provide services to the City of New York. And the district court and this court said, no, this is just an ipsy-dixit market. Like, what about other healthcare insurers that provide services to people in the State of New York? And that's what we have here. I don't know if I've answered your question, Judge Robinson, but if I haven't, please let me know. No, no, I mean, you have, but I guess one of the other things I'm struggling with, given the pleading posture that we're hearing on the pleadings, I think most of us in this room have views, whether they're assumptions or well-founded views, about cross-elasticity of demand between an Ivy League school and any number of other schools. And one of the things I'm trying to figure out is, to what extent are we allowed at the pleading stage to draw on our, what feels to us like our common sense, our life experience, versus waiting to see the data? I guess that's what I'm, I guess that's my. So, waiting to see the data is another word for imposing probably $10 million conservatively of discovery costs on these non-profit institutions. And the direct answer to your question is, and the Supreme Court has acknowledged this too, we don't require judges to leave their common sense at the door, but in any event, you could leave your common sense at the door. We have a case in which they are saying, look, because we are arguing direct effects, that is because we contend that Ivy League athletes have to pay more for their education than they would have if the schools offered athletic scholarships, we don't have to prove a market. That's it. That's their contention. That is so manifestly wrong because antitrust law is concerned with market-wide effects. They have to prove anti-competitive effects across a market. Their argument is essentially an argument that, look, a conference is a kind of joint venture. There are 52 conferences in Division I in the NCAA. Each conference tries to define what is unique about that conference in a different way. I mean you only have to look at the advertising for the Big Ten or the Pac-12 to know that. And the fact that the Ivy League has to advertise itself as offering the pinnacle of, arguably, the pinnacle of academics and athletics, although so far as I can tell, there's only one Ivy League team that has ever won a national championship in any sport. There's two. There are two? Cornell is both in hockey and in lacrosse. I think I did say one school. But actually what I was thinking was of the Princeton women's basketball team at one point, and maybe when Bill Bradley was at Princeton. In any event, the point here I think is that my friend says, look, if you get a bunch of schools, whether it's eight Ivy League schools or six Ivy League schools that agree to do something and it causes a price increase in the people who are attending those schools, that's a definition of a market. No, it's not. That's a definition of a conference, which has established its own rules in order to maintain, you know, as the Supreme Court has recognized, you know, in many of its cases, the general operating rules of an athletic conference. And it is simply one conference among many. And what we're talking about here is, you know, if the only issue were that these institutions were trying to compete on the basis of athletics, it is true that the Ivy Leagues probably, if that's what their objective was, their only objective was, would probably start offering athletic scholarships too. But we're talking here about a combination complex market in which what's being offered is both academics and athletics, which is, this is all pleaded in the complaint. And one conference decides, and decisions are being made by individual athlete academic applicants, depending on what's important to them. If, as I said, if a high school, a five-star brilliant basketball player applying to college, you know, could get into an Ivy League school or Stanford, there's only one Ivy League school that has ever made it to the postseason in basketball, and that is Princeton. And the notion that they have that athlete who wants to play in the NBA or the WNBA is not going to consider Duke and Stanford and Northwestern and UCLA is, it's crazy. And I realize that this is, maybe this is starting to seem like, well, maybe we have to use our common sense and can we or can't we. This is a case in which even with respect to the incoherent all-sports market, the plaintiffs allege in paragraphs 11 and 231 that there are economic substitutes, that is, non-Ivy League schools that are, quote, competing with the Ivy League for highly qualified athletes and academics. And if there were something other than an illustrative list, and if it were plausible that there was a single universe of reasonable substitutes across all sports, that is, somebody who wanted to do cross-country would be looking at the same group of schools as somebody who wanted to fence, that would be a different case. I think we have your argument. Thank you. Okay. Thank you very much. So a lot to cover, and I will try to be focused and relatively brief. First on the question of what should the court do and not do. It's not true that the Second Circuit hasn't spoken to that standard. In Regeneron just recently, this court said unless it is obvious, absolutely obvious, that a non-included substitute is an economic substitute, not a functional substitute, but with sufficiently high cross-elasticity of demand, or if the plaintiffs have completely failed to address cross-elasticity of demand, then 12b-6 is inappropriate. And here neither of those is satisfied. The court specifically said it may be unintuitive. Can you tell me what is the product? Yes. So that's another – thank you for that. Is it elite student athletes? No. Is it – Yeah. So in Todd v. Exxon, this court addressed a buyer-side monopsony case and reversed under 12b-6 and rejected just the arguments that opposing counsel is making. So what the court said is what matters is the seller or the buyer's equivalent. So what we're talking about as relevant here is what schools offer elite opportunities, the very top elite opportunities in athleticism and academics to students. But for any individual student, there's very unlikely to be more than one elite sport. I mean, there are swimmers who probably can't run. Yes. And there are debaters who can't do anything. So I think you're really – I don't know how you're characterizing this group of people. Right. To be clear, and this is exactly what Todd v. Exxon said, was that opposing counsel is looking through the long end of the telescope, right, because there what happened was a bunch of employers in the petroleum and oil industry had information sharing, a rule of reason analysis, and the allegation under the rule of reason is they suppressed compensation by sharing information. And the court – and one of the things – the plaintiffs included accountants, engineers, attorneys, and the defendant said, wait a second, those aren't substitutes. And what this court said is you've got it exactly backwards. The question is not whether they are substitutes for each other. The question is whether the employers are substitutes for each other. And here the Ivys, those Ivys that offer each of these sports, and certainly the group as a whole, are, we allege, in a plausible way, are substitutes for each other that provide a level of opportunity that many students perceive as sufficiently distinctive, that they would rather go to an Ivy League without an athletic scholarship than a non-Ivy with an athletic scholarship. There are many students who experience that, and that's enough. Even if it's unintuitive. But there's a little leakage there because you admit that there's at least four that gets added to the A, and therefore it's open-ended how many there really are. And when you talk about schools that are academically elite, I mean, are you talking about liberal arts? Or, I mean, you could say it's elite because they have a great economics program, but is economics actually more of a rigorous study than agriculture? There's a lot of leakage here in your theory. We 100% do not admit that. I want to be so clear about that. Regeneron identified a key distinction between a functional substitute, a product or an option that can perform the same functions, and an economic substitute where there's such a high cost elasticity of demand that if you don't include them in an agreement, the agreement will not be sustainable. The problem is that you take this kind of uniformity of appeal or uniformity of offering with this, quote, Ivy thing, and somehow that's different from, but then you don't really want to define it because the Ivies present many different lines of studies. Some schools have their strengths over others, but from the perspective of the student athlete that's being damaged by this, you presume uniformity, but that doesn't hold. That doesn't make any sense to any parent that's had children that went through the process of sifting through where the college is. It doesn't hold with regard to the Heisman Trophy winner, Fernando Mendoza. He was admitted to Yale. Where did he go to school? Cal. In three years, he graduated with an economics degree because Cal has an excellent program. Then he spent his last year of eligibility winning the Heisman Trophy in Indiana, a national championship. So he turned down Yale. He was offered to play football there. So there's a myriad of these examples. There's too many shifting. There's too much shifting here to say that this is uniform. They only want to go to the Ivy League, and because of price fixing, they're denied that opportunity or they have to pay more. It doesn't make any sense to me. I appreciate that, Your Honor. What I want to say to be very clear about this is nobody is alleging, and nobody has to allege, that every single student will perceive the Ivys as sufficiently distinctive. How many do you have? You've talked about the fact that your two plaintiffs represent a class of people who were denied their wages, were suppressed because they couldn't get athletic scholarships. What makes them representative of hundreds of thousands of other people that apply to an Ivy school and also apply to other schools and also happen to have been four-star senior recruits with regard to their respective sport, from wrestling to fencing to cross-country to weightlifting to ping pong? Right, and the standard economic answer is when a bunch of actors get together and by their own admission would be unable to suppress compensation without an agreement, but collectively they can, and that is what we have all accepted on this appeal. Then, if they are able to sustain it, there is not such a high cross-elasticity of demand. Don't you plausibly have to show that they could suppress compensation? They may be able to suppress compensation within their own little environment, but is that the real market? If it turns out that there are 40 comparable schools and the Ivies represent 20%, is that combination sufficient for Sherman or for antitrust liability? I think the answer would be, at the very least, that is exactly why discovery is necessary. We believe that we've plausibly alleged, so the answer would be, if that's true… What if it was 10%? Then the Ivy agreement would have failed. That's what standard economics says. How do we know if it succeeds? I mean, the sports teams at the Ivy schools are not dominating national collegiate sports. To be clear, the success means they are successfully able to suppress compensation to their athletes by not offering athletic scholarships, and they have said that they've succeeded. They have said, we need to redistribute. They have said, in the absence of the Ivy agreement, we would be paying athletic scholarships. We couldn't resist this on our own. That's the only way to make sense of their redistribution argument. Is the athletic scholarship then the only price that these students were interested in, or were they interested in other things also, such that they may have decided to go to an Ivy school, even though they couldn't get an athletic scholarship? Right. To be clear, and the defendant's opposition brief by asserting pro-competitive justification says that one market effect, one effect on the Ivies with the absence of this agreement, would be that they would not be able to resist athletic scholarships. And that's why they say, for example, we take this money. By not paying athletes, we take this money from them, and it enables us to give more financial aid based on deed. Now, that is a fact that they absolutely shouldn't. The second fact, they can't assert at this stage. That's an evidentiary question. But on the first fact, they have conceded that they would be paying more to their student athletes. They claim, therefore, less based on financial aid. Money could go lots of places. But they have admitted the anti-competitive effect that is the purpose of the relevant market input. I mean, in this, again, you're stepping way back and doing sort of a common sense, they've sustained the agreement this long, it must be anti-competitive. But why doesn't the same sort of common sense analysis say they've sustained this agreement for a very long time, and they've bled the most elite student athletes? We know that from common sense, from looking at who's winning national championships, especially in the sort of marquee sports. Why doesn't that disprove your theory that they've succeeded in sustaining an anti-competitive effect? Two reasons. One, we haven't alleged that. But two, and so we're limited to the face of complaint. But two, it's not just a common sense argument I'm making. It is an argument that follows logically from the relevant legal standard. Regeneron, endless cases say you do a hypothetical monopsonist or monopolist test. You ask if this group of market actors get together, are they able to have a price effect? That's the actual technical argument. A price effect within a market, not on their own prices, right? That is how you define a market. That is precisely how one defines a market, according to Biden. I think we've covered this ground. I think we're unless folks, anybody else have any further questions? Appreciate your arguments. Thank you both. We will take this under advisement. Thank you, Your Honor. It was Judge Thompson, not Judge Robinson. No, no, yeah, I appear in a lot of places and a lot of times. We have two cases on submission today, 236930 Carbajal-Carbajal v. Bondi and 251237 Francois v. Richmond. We'll take those on submission. And with that, we can adjourn today's proceedings. Court stands adjourned. Thanks, everybody. Thank you.